1
2
3           UNITED STATES DISTRICT COURT
4           NORTHERN DISTRICT OF CALIFORNIA
5

6   SALAH UDDIN,                          Case No. 24-cv-02532-WHO

7                   Plaintiff,

8           v.                            **ORDER GRANTING IN PART AND
                                          DENYING IN PART MOTIONS TO
9   AUTOMOBILI LAMBORGHINI                DISMISS**
    AMERICA, LLC, et al.,
10                                        Re: Dkt. Nos. 67, 68, 69
                    Defendants.
11

12          Plaintiff Salah Uddin is suing several entities involved in the purchase and servicing of a

13   2020 Lamborghini Aventador (the "Vehicle"), alleging that some or all of them violated the Truth

14   in Mileage Act ("TIMA"), 49 U.S.C. § 32701, *et seq*., breached express and implied warranties

15   that accompanied the Vehicle, violated California and federal consumer protection laws, were

16   negligent, and committed various other related torts. Each defendant has moved to dismiss all

17   claims against them in Uddin's second amended complaint. The motions to dismiss are

18   GRANTED on all claims **except** Uddin's claim for breach of the implied warranty of fitness for a

19   particular purpose, which may proceed against both the manufacturer, defendant Automobili

20   Lamborghini America ("ALA"), and the dealership, defendant Lamborghini North Los Angeles

21   ("LNLA"). Otherwise, Uddin's claims are not plausibly alleged: his TIMA claim is time-barred

22   and he has failed to allege the requisite intent, he identifies no cognizable breach of the Vehicle's

23   express warranty, his implied warranty of merchantability claim fails because the Vehicle is fit for

24   ordinary use, and his tort claims are barred by the economic loss rule, among other reasons.

25                                  **BACKGROUND**

26          Uddin has alleged a great deal. The wide range of claims, together with the nearly seven-

27   year timeline and numerous defendants implicated, has forced me to provide a more extensive

28

*United States District Court*
*Northern District of California*

background than is typical. The allegations are Uddin's, which I accept as true for pleading purposes.

### A.    Ordering the Vehicle

In June 2018, Uddin placed a deposit for a custom-built 2020 Lamborghini Aventador SVJ Roadster (the "Vehicle") with defendant Lamborghini North Los Angeles ("LNLA").[1]  Second Amended Complaint ("SAC") [Dkt. No. 65] ¶ 10-11.  The car was designed as a "unique collectible vehicle."  *Id.* ¶ 13.  Before purchasing the Vehicle, Uddin spoke with LNLA General Manager Ron Giger during the Monterey Car Week in August 2018.  *Id.* ¶ 11.  The following year, Giger arranged for a meeting between Uddin and representatives of the Vehicle manufacturer, Automobili Lamborghini America, LLC ("ALA") at the 2019 Monterey Car Week. *Id.* ¶ 12.  The purpose of the August 2019 meeting was for ALA to help Uddin to select specific options and customizations for the Vehicle to enhance its value to Uddin.  *Id.*  According to Uddin, ALA's expertise was critical to this process.  *Id.*

At the August 2019 meeting, ALA representatives asked Uddin about his goals for his future Vehicle.  *Id.* ¶ 13.  Uddin explained that he was a car collector and that he intended to add the Vehicle to his collectible car collection.  *Id.*  Uddin and ALA identified a car that Uddin liked and decided to "replicate the show car's exquisite interior design specifications," which were to be "reproduced into Uddin's . . . own vehicle."  *Id.*

Throughout the process of designing the cars, between 2018 and 2019, Uddin "frequently discussed the vehicle's significance to him as a highly collectible vehicle being added to his collection."  *Id.*  According to the SAC, he "emphasized the importance of maintaining its integrity for originality and authenticity as factory original numbers matching, since as a car collector, these would impact maximizing investment value, long-term appreciation, collectability, factory original provenance, and enjoyment."  *Id.*

The order process itself was not smooth.  There were inconsistencies in some of the paperwork provided by ALA personnel to Uddin, which led Uddin to ask LNLA General Manager

---

[1] LNLA is owned by Boardwalk Automobiles Palo Alto ("BAPA").  At times, the parties refer to this defendant as LNLA, at times, BAPA.  Throughout this order, I refer to it as LNLA.

Giger to confirm that the order of his customized interior was to match the show car that he had identified in August 2019. *Id.* ¶¶ 13-15. Giger listed Uddin's requirements in order documents and communicated them to ALA. *Id.*

**B.      Arrival of the Vehicle at LNLA Service Center**

On April 28, 2020, Uddin travelled to Los Angeles from the San Francisco Bay Area to witness the arrival of his vehicle. *Id.* ¶ 16. When the Vehicle arrived at the LNLA dealership, LNLA's initial inspection revealed a "series of defects, damage, and mishandling." *Id.* Uddin was informed that the vehicle had difficulty starting and "operating at the port." *Id.* ¶ 17. When the pre-delivery inspection was conducted, Uddin and LNLA personnel noted "damage to body panels." *Id.*

The Vehicle was then transported to the LNLA service center. *Id.* ¶ 17-18. It failed to start. *Id.* ¶ 18. The next day, Uddin returned to review the Vehicle once again. *Id.* He did a more thorough review of the exterior finishes and discovered "defects including chipping, scratches, and scraping onto the original finishes . . . and painted engine cover, lower rear and undertray cover, emergency door handle cover, defective authenticity labels and trims." *Id.* The Vehicle was not operational, and the LNLA technician also identified "substantial electronic malfunctions affecting [its] operation and computer systems." *Id.*

On April 28, 2020, and April 29, 2020, Giger "made apologies and promises to Uddin of the dealership's commitment to rectify every single issue with the vehicle to Uddin's complete satisfaction." *Id.* ¶ 19. Then Giger "asked that Uddin proceed with completing the sale paperwork in order to book the sale to help the dealer with slow sales before the end of the month, assuring the vehicle would be in fully new and defect free condition as was custom ordered." *Id.* Uddin agreed to this. *Id.* LNLA proceeded with the sale completion and warranty activation "without ensuring that the vehicle was operation[al] upon delivery." *Id.* ¶ 20. LNLA "at all times possessed the vehicle after initial arrival of the non-operational vehicle, its books, and accessories," and the Vehicle was "not delivered to, functionally reviewed, or operationally demonstrated with Uddin before, at, or after point of sale." *Id.*

On April 29, 2020, Uddin signed the Lease Agreement (to which LNLA was the lessor and

3

he the lessee).  Exhibits for Second Amended Complaint Ex. A, p. 1. ("SAC Ex.") [Dkt. No. 66].

The Lease Agreement, under the subsection labeled "Vehicle description," listed the odometer

reading at 40 miles.  *Id.*  The Odometer Disclosure Statement, which was included in the bill of

sales paperwork as required under state and federal law upon transfer of ownership, also stated

that "[t]he odometer now reads 40 miles," as of April 29, 2020.  *Id.*, at p. 9 (April 29, 2020,

Odometer Disclosure Statement).  The same day, Uddin received a new car warranty to which

ALA was the warrantor, SAC Ex. B (Lamborghini Limited Warranty), and LNLA filled out a pre-

delivery inspection coupon, certifying that "all pre-delivery inspections have been carried out

according to the procedures specified by Automobili Lamborghini S.p.A, and that the vehicle is

suitable for sale."  SAC Ex. B (ALA pre-delivery inspection coupon, filled out by LNLA

personnel on April 29, 2020).  That pre-delivery inspection coupon stated that the Vehicle had 30

miles on it, not 40.  *See id.*

### C.    LNLA's Efforts to Repair

After Uddin signed the contract, he communicated with Giger and David Melton, the

Service Manager at LNLA, about a "comprehensive repair plan."  SAC ¶ 21.  The "initial

operational and electronic malfunctions hindering the new vehicle's function and operation were

eventually addressed over the course of weeks."  *Id.* ¶ 22.

The "preliminary efforts to correct" the cosmetic and authentication defects, however, fell

short of Uddin's expectations.  *Id.* ¶ 22.  Giger "persuaded" Uddin to allow LNLA to transport the

"unfinished car" to Uddin's storage to give the dealer more time to pursue remedies.  *Id.*

Accordingly, on May 22, 2020, Uddin received the Vehicle in Northern California.  *Id.* ¶ 23.  He

continued to communicate with Giger about how its cosmetic and authentication problems could

be perfected.  *Id.*  By early July 2020, Giger promised to provide a new factory-original

replacement engine cover and all related replacement hardware and authenticity labelling.  *Id.*

Uddin remained concerned about preserving the vehicle's factory originality and authenticity,

which was "critical . . . for maximizing its future integrity, value, appreciation, and provenance as

a collectible."  *Id.* ¶ 24.

In an effort to resolve the problems, Giger escalated the issue to Rene Sueltzner, the head

4

of Lamborghini Aftersales at ALA.  *Id.* ¶ 25.  Sometime thereafter, Giger had finalized plans to replace the engine cover to the standards discussed.  *Id.*  Over the course of the following weeks, Uddin "received no updates."  *Id.* ¶ 26.  Three months after transacting for the Vehicle with LNLA, LNLA was sold by BAPA to Westlake Coach Company, which "led to a noticeable reduction in prioritization for Uddin's grievances."  *Id.*[2]  Giger resigned from the dealership sometime in August 2020.  *Id.*  LNLA's business continued at the newly opened Lamborghini Westlake Village.  *Id.*

### D.    Dealership Ownership Change

After LNLA was sold to Westlake Coach Company, Uddin worked with Melton (who moved to the role of Service Manager of Lamborghini Westlake Village) to continue perfecting the Vehicle.  *Id.* ¶ 28.  In a call on August 4, 2020, Melton told Uddin that the first replacement engine cover was destroyed during shipping due to improper packing efforts.  *Id.* ¶ 29.  They also discussed the "ongoing absence of the commemorative car model that was to have arrived as part of the limited edition vehicle's original equipment provision, and previously promised Lamborghini apparel as part of the original sales provisions that remained incomplete."  *Id.*  Melton told Uddin he would work on the items.  *Id.*

Uddin did not hear anything from Melton for a few weeks, so he called Melton again on August 24, 2020, and the two discussed "the timing of the replacement engine cover and verification of its specifications, including the carbon fiber, paint finishes, and hardware, which were essential to preserving the factory authentic condition."  *Id.* ¶ 30.  In that conversation, Melton asked that Uddin physically remove a painted body panel for the bodyshop to use as a paint-match.  *Id.*  More discussions about perfecting the exterior of the car continued through September.  *See* SAC. ¶¶ 30-32.

In October 2020, Melton emailed Uddin informing him that the paintwork on the second replacement engine cover was complete and that the Vehicle awaited pickup.  *Id.* ¶ 34.  Uddin learned that "the finishing of the replacement engine cover was performed outside of the factory's

---

[2] Westlake Coach Company (d/b/a Lamborghini Westlake Village) was originally named as a defendant in this action, but was voluntarily dismissed by Uddin on July 10, 2024.  Dkt. No. 40.

United States District Court
Northern District of California

United States District Court
Northern District of California

paint shop, resulting in a deviation from its factory-original condition and diminishing authenticity and originality." *Id.* ¶ 35. Uddin continued to communicate with Lamborghini Westlake Village's bodyshop to "address his questions about quality, finish details, and other specific hardware details" that remained unanswered. *Id.* ¶ 36. He spoke with the bodyshop's General Manager, Sean Russell, on October 28, 2020, about how to fix the persisting cosmetic issues. *Id.* ¶¶ 36-38. Those issues included erroneous authenticity labels, "design features" that did not match factory originals, "backside engine cover finishes" that had to be refinished again, and a lack of clarity about whether replacement locks and hardware features matched originals on the car. *Id.* ¶¶ 37-41.

Throughout November and December 2020, Uddin continued to communicate with Melton about the cosmetic issues. *Id.* ¶¶ 40-45. Melton told him that ALA representatives would contact him, but they did not. *Id.* When Uddin asked the Lamborghini Westlake Village bodyshop owner, Ray Shahi, for help, Shahi put him in contact with ALA representatives. *Id.* ¶¶ 44-45. After December 2020, Uddin did not hear from Melton or Lamborghini Westlake Village again. *Id.* ¶ 45.

### E.    ALA's Involvement with Respect to Perfecting the Vehicle

After Shahi put Uddin in contact with ALA, Uddin had a phone conversation with ALA representatives William Gonzalez (Western Region ALA Aftersales Manager) and Nick Cardoni (Customer Relations Lead). *Id.* ¶ 46. Uddin explained to them all the problems with the car since its arrival on April 28, 2020. *Id.* He asked that ALA help him address all the cosmetic issues and missing commemorative gear and to "work on a plan to make up for his poor experience[.]" *Id.* The ALA representatives apologized for his experience and promised they would help. *Id.* ¶ 47.

On February 8, 2021, Uddin spoke again with Cardoni, and Cardoni confirmed that the reworked engine cover was completed and ready to ship, along with new authenticity labels. *Id.* ¶ 49. Uddin reminded him of other cosmetic issues. *Id.* ALA made plans to ship the engine cover from the bodyshop at Lamborghini Westlake Village to Uddin's location in Northern California, and to install the engine cover once it arrived. *Id.* ¶ 50. Installation was to happen at Lamborghini San Francisco, also owned by BAPA's owners. *Id.* On February 10, 2021, Uddin received the

commemorative model he sought. *Id.* ¶ 51. It was in poor condition; Uddin alerted ALA. *Id.* ¶¶ 51-52.

On February 12, 2021, Uddin spoke once again with Cardoni and Gonzalez. *Id.* ¶ 52. He brought up many issues, including the missing carbon skin from the interior of the Vehicle, which was apparently still not addressed. *Id.* ¶ 52. Cardoni asked Uddin for proof that he ordered the carbon skin, which was apparently an add-on feature. *Id.* ¶ 53. Uddin added Giger, who had been resigned from LNLA for 18 months, into the call, to confirm that he had ordered the carbon skin. Giger allegedly "defended Uddin" and "admitted that this was ALA and the LNLA's responsibility and oversight." *Id.* The ALA representatives then promised Uddin they would take care of the issues and immediately following the call, Cardoni emailed Uddin to inform him that the engine cover had been shipped and ALA would address the other issues. *Id.* ¶ 54.

On March 1, 2021, Bradd Troedel, the Service Manager at Lamborghini San Francisco, called Uddin to plan for the upcoming engine cover installation. *Id.* ¶ 55. On March 20, 2021, an in-person inspection of the engine cover occurred. *Id.* ¶ 58. Uddin observed a "series of defects" with the cover, all of which were cosmetic. *Id.* He reported these issues to ALA on March 26, 2021. *Id.* ¶ 59. During this time, Uddin was making lease payments on the Vehicle. *Id.* ¶ 65. ALA did not respond to Uddin's latest concerns until July 7, 2021, when it asked him to complete a formal draft letter that stated the engine cover had been completed. *See id.* ¶¶ 60-63, 68.

Uddin responded two days later, stating that he was not satisfied with the Vehicle. *Id.* ¶ 69. On July 20, 2021, Uddin spoke with Cardoni and Gonzalez again and expressed his dissatisfaction with their delay and his imperfect Vehicle. *Id.* ¶¶ 68-71. Cardoni apologized for the delay. *Id.* ¶ 73. Uddin reiterated his desire that the Vehicle be perfected, and also asked that ALA refund him all lease payments paid until his grievances were resolved. He also sought a discount since he was originally entitled to a new and defect free Vehicle. *Id.* ¶ 76.

On July 28, 2021, Cardoni provided Uddin with the proper authenticity labels and informed him that the replacement commemorative model car would be shipped within the month. *Id.* ¶ 78. Uddin received that replacement in early September, but found more problems with its interior; it did not match the interior of the Vehicle now that it had been modified from the

United States District Court
Northern District of California

1    original model.  *Id.* ¶ 83.  On August 3, 2021, in response to an inquiry from Uddin, Cardoni

2    explained that they were awaiting approval from ALA leadership on a "compensation offer" to

3    make up for Uddin's hardship.  *Id.* ¶ 80.  Uddin received the replacement authenticity labels

4    sometime in October 2021 and was dissatisfied with them, because they did not match

5    expectations.  *Id.* ¶ 86.  Cardoni responded to Uddin's complaint about the labels in late November

6    2021 and stated that ALA was trying to resolve the issue.  *Id.* ¶ 87.

7         ALA did not respond to Uddin's continued complaints until April 19, 2022, when Cardoni

8    outlined a plan for addressing the label issues, having the car inspected, addressing any

9    nonconformities, and providing documentation outlining the vehicle is "to spec." *Id.* ¶ 92.  Uddin

10   had another call with ALA on April 20, 2022, where Uddin reviewed all of his problems starting

11   in 2020.  *Id.*  ¶ 93.  Again, Cardoni apologized and committed to working toward a resolution and

12   compensation plan.  *Id.*  To that end, Cardoni emailed Uddin on April 28, 2022, informing him

13   that the authenticity labels were once again being worked on, giving a completion estimation, and

14   addressing other problems.  *Id.* ¶ 94.  On May 11, 2022, Cardoni shared "proof of the engine cover

15   authenticity label" with Uddin, which Uddin again determined was incorrect.  *Id.* ¶ 95.  After this,

16   communication fell off for a while, with Uddin receiving only sparse responses from the ALA

17   representatives throughout the rest of 2022.  *Id.* ¶¶ 95-98.

18        On March 29, 2023, Uddin emailed ALA, proposing compensation offers and asking for a

19   three-year extension of the "soon to expire three-year new car warranty based on contract signing

20   date which would later be found to be erroneous." *Id.* ¶ 103.  Cardoni responded on April 22,

21   2023, explaining that Uddin's proposal was under review.  The three-year mark on the new car

22   warranty expired on April 29, 2023.  *Id.* ¶ 105.  Uddin claims that ALA "did not disclose the true

23   date of warranty coverage of January 5, 2020, before the vehicle was manufactured[.]" *Id.*  Uddin

24   did not hear anything from ALA about his proposal or the warranty extension until October 2023.

25   *Id.* ¶ 113.  On October 11, 2023, Uddin emailed a demand letter articulating his frustration with

26   what he perceived to be neglect.  *Id.* ¶ 112.  He said he would pursue legal action if he did not

27   receive a response within five days.  *Id.*  Cardoni responded to the demand letter the same day,

28   promising to provide an offer soon.  *Id.* ¶ 113.  Two days later, Cardoni emailed Uddin ALA's

United States District Court
Northern District of California

1  offer to Uddin to compensate him for his experience.  *Id.*  ALA offered Uddin $20,000.00 and a

2  one-year warranty extension.  *Id.*

3       As the Vehicle's lease approached its maturity date (January 1, 2024), Uddin contacted

4  defendant Lamborghini Financial Services (d/b/a "Porsche Financial Services," hereafter

5  "Porsche"), to discuss lease-end options.  *Id.* ¶ 115.  Porsche informed him about the requirement

6  to complete an Odometer Disclosure Statement, which is necessary for "any decisions regarding

7  the purchase of the vehicle."  *Id.*  When preparing for these lease-end options, Uddin discovered

8  what he describes as a "significant discrepancy" between the Vehicle's documented mileage in the

9  contract and the Vehicle's actual mileage, which "compromised its status as a surviving original

10  mileage vehicle." *Id.* ¶¶ 115-116.  The Lease Agreement (that Uddin had signed on April 29,

11  2020), and the Odometer Disclosure Statement found in the bill of sale paperwork (also signed by

12  Uddin on April 29, 2020) stated that as of the date of signing, there were 40 miles on the Vehicle

13  (SAC Ex. A, at pp. 1, 10), but the "Predelivery inspection coupon" that LNLA had filled out on

14  April 29, 2020, stated that there were 30 miles on the Vehicle (SAC Ex. B).

15       Uddin became concerned about the odometer discrepancy's impact on the Vehicle's value

16  and asked that Porsche propose a plan to rectify the problem, explaining that he had proof of the

17  Vehicle's true mileage.  *Id.* ¶ 116-118.  Porsche responded, explaining that it could only accept

18  proof from the selling dealer, LNLA, which at that point had been purchased by Lamborghini

19  Westlake Village.  *Id.* ¶ 118.  Uddin informed Porsche that he would sue it if the problem was not

20  solved.  *Id.* ¶ 121.  Porsche proposed a two-month lease extension, which Uddin accepted.  *Id.*  At

21  the end of that extension, Uddin had another phone call with a representative from Porsche,

22  wherein the loan servicer agreed to extend the lease by *another* two months, making the end of the

23  lease May 1, 2024.  *Id.* ¶¶ 122-123.

24       Uddin sent ALA a draft of his complaint on April 10, 2024.  Cardoni responded on behalf

25  of ALA by reiterating their settlement offer and compensation offer.  *Id.* ¶ 124.  Uddin filed the

26  underlying complaint on April 26, 2024, naming ALA, LNLA, Porsche, and Lamborghini

27  Westlake Village as defendants.

28

### F.    Procedural Background

On May 3, 2024, Uddin filed a request for a Temporary Restraining Order ("TRO") and a preliminary injunction against ALA and Porsche, seeking to pause the lease end process during litigation. *See* Dkt. No. 8. I held a hearing and denied the TRO and preliminary injunction, finding that the circumstances did not warrant emergency relief. At my direction, following that hearing, Uddin spoke with representatives for Porsche, the lender, to negotiate a lease extension. Porsche proposed a one-time, four-month lease extension, which Uddin apparently rejected. On June 14, 2024, Uddin completed the lease buyout process and submitted the odometer disclosure statement which listed the mileage of the car at 31 miles. SAC ¶ 131.

Uddin's Second Amended Complaint asserts nine causes of action, against various defendants: he asserts a claim for violation of the Truth in Mileage Act against LNLA and Porsche (Claim One); claims for breach of express warranty in violation of the California Commercial Code and the California Song-Beverly Act against ALA and LNLA (Claim Two); a claim for breach of the implied warranties of merchantability and fitness for a particular purpose in violation of the Song-Beverly Act against all defendants (Claim Three); a generalized claim for breach of the Song-Beverly Act against all defendants (Claim Four); a negligence claim against ALA (Claim Five); a claim for misrepresentations and omissions against all defendants (Claim Six); a claim for recklessness/gross negligence against ALA (Claim Seven); a claim for fraud/deceit against all defendants (Claim Eight); and a claim for promissory estoppel, hindrance, and inducement against ALA and LNLA (Claim Nine). Defendants have once again moved to dismiss all of Uddin's claims, this time, separately. *See* Dkt. Nos. 67 (ALA Motion to Dismiss), 68 (Porsche Motion to Dismiss), 69 (LNLA Motion to Dismiss).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

## I.    TRUTH IN MILEAGE ACT (CLAIM ONE)

Uddin asserts that LNLA and Porsche both violated the Federal Odometer Act, 49 U.S.C. § 32701, *et seq*, (which Uddin refers to as the "Truth in Mileage Act," or "TIMA") by, in the case of the former, misrepresenting the Vehicle's mileage and, in the case of the latter, failing to correct those misrepresentations after Uddin pointed them out.

The statutory scheme behind TIMA starts with a list of Congress's findings and purposes.
Congress finds that—
(1) buyers of motor vehicles rely heavily on the odometer reading as an index of the condition and value of a vehicle;
(2) buyers are entitled to rely on the odometer reading as an accurate indication of the mileage of the vehicle;
(3) an accurate indication of the mileage assists a buyer in deciding on the safety and reliability of the vehicle; and
(4) motor vehicles move in, or affect, interstate and foreign commerce.

1    *Id.* § 32701(a).  TIMA's purposes are "(1) to prohibit tampering with motor vehicle odometers;

2    and (2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or

3    reset odometers."  *Id.* § 32701(b).  "Congress effectuated these purposes by outlawing actions that

4    would cause discrepancies between a vehicle's actual mileage and its odometer reading."  *Bodine*

5    *v. Graco, Inc.*, 533 F.3d 1145, 1149 (9th Cir. 2008).

6         The TIMA requires the transferor of a motor vehicle to disclose in writing either "the

7    cumulative mileage registered on the [vehicle's] odometer" or to "[d]isclose that the actual

8    mileage is unknown, if the transferor knows the odometer reading is different from the number of

9    miles the vehicle has actually traveled."  49 U.S.C. § 32705.  This written disclosure must be

10   signed by the transferor and transferee, and must contain: (1) "[t]he odometer reading at the time

11   of transfer (not to include tenths of miles)"; (2) "[t]he date of transfer"; (3) "[t]he transferor's

12   name and current address"; (4) "[t]he transferee's name and current address"; and (5) "[t]he

13   identity of the vehicle, including its make, model, year, and body type, and its vehicle

14   identification number."  49 C.F.R. § 580.5(c), (f).  Additionally, the written disclosure must

15   include the transferor's certification that: (1) "to the best of his knowledge the odometer reading

16   reflects the actual mileage"; (2) "the odometer reading reflects the amount of mileage in excess of

17   the designated mechanical odometer limit"; or (3) "the odometer reading does not reflect the

18   actual mileage, and should not be relied upon."  49 C.F.R. § 580.5(d)-(e).

19        As for damages, under the statute, "[a] person that violates this chapter or a regulation

20   prescribed or order issued under this chapter, with intent to defraud, is liable for 3 times the actual

21   damages or $10,000, whichever is greater." 49 U.S.C. § 32710(a).  Courts have observed that

22   Congress's provision for statutory damages of $10,000 per vehicle allows victims to recover

23   without proving actual damages.  *See Haddon v. FS Invs. of Am., Inc.*, No. 8:23-CV-00709-WFJ-

24   SPF, 2025 WL 36082, at *3 (M.D. Fla. Jan. 6, 2025); *Womack v. Nissan N. Am., Inc.*, 550 F.

25   Supp. 2d 630, 634 (E.D. Tex. 2007); *Gen. of Md. v. Dickson*, 717 F. Supp. 1090, 1105 (D. Md.

26   1989).

27        **A.      As Asserted Against LNLA**

28        To state a TIMA claim, a plaintiff "must allege that the defendant violated [TIMA] with

12

1    intent to defraud as to mileage." *Bodine*, 533 F.3d at 1151; *see also* 49 U.S.C. § 578.6(f)(2).

2    Because such a claim sounds in fraud, Rule 9(b) applies. *See Whitley Int'l Co., Ltd. v. Pyne RV*

3    *Rentals, Inc*., No. 15-cv-02887-FMO-JPR, 2016 WL 3090322, at *5 (C.D. Cal. May 31, 2016).

4    "A transferor of a vehicle may be found to have intended to defraud if he had reason to know the

5    mileage on the vehicle was *more* than was reflected by the odometer or certification of the

6    previous owner and nevertheless failed to take reasonable steps to determine the actual mileage."

7    *Haynes v. Manning,* 917 F.2d 450, 453 (10th Cir. 1990) (per curiam) (emphasis added).

8        Uddin's TIMA claim against LNLA suffers from two major problems: (1) it is barred by

9    the statute of limitations; and (2) Uddin does not plead facts that, if true, would show an intent to

10   defraud.

### 1.    Statute of Limitations

12       Uddin is asserting a statutory violation that has a three-year statute of limitations per

13   California Code of Civil Procedure section 338(a). *See* Cal. Code. Civ. P. § 338(a) (lawsuits

14   based on a liability created by statute must be filed within three years of the cause of action

15   accruing). He insists that what is commonly referred to as the "discovery rule" tolled the statute of

16   limitations, but the timeline does not support his position. Under the discovery rule, the statute of

17   limitations on a cause of action does not begin to run until the plaintiff knows or has reason to

18   know of the injury which is the basis of the action. *See Norton v. LVNV Funding, LLC*, 396 F.

19   Supp. 3d 901 (N.D. Cal. 2019); *Metabyte, Inc. v. Technicolor S.A.*, 94 Cal. App. 5th 265 (Aug. 9,

20   2023). The statute of limitations has run on this claim because Uddin had everything that he

21   needed to identify the discrepancy when he started the Lease on April 29, 2020.

22       Uddin alleges that LNLA falsely recorded the Vehicle's mileage as 40 miles on both the

23   Lamborghini Financial Services lease contract and bill of sale paperwork dated April 29, 2020

24   (*see* SAC Exhibit A), when the Vehicle's odometer indicated its mileage to be only 30 miles.

25   SAC ¶ 139(a). A service record titled "Cupón A 1500 mls (2500 km)" (*see* SAC Exhibit B) was

26   also entered into the vehicle's warranty and service booklet on April 29, 2020, and it listed the

27   odometer reading at 30 miles. SAC Ex. B (mileage "coupon" signed by LNLA representative on

28   April 29, 2020, certifying that the mileage on the car was 30 miles as of April 29, 2020). At oral

1    argument, Uddin conceded that he possessed the lease contract and bill of sale paperwork, both of

2    which listed the mileage as "40 miles," and the mileage coupon listing the mileage as "30 miles,"

3    from the time that he received the Vehicle's papers on April 29, 2020.

4        Uddin asserts that the statute of limitations did not begin to run until the date that he sat

5    down to fill out the odometer statement at the end of his lease, which is when he said the

6    "discrepancy arose" upon his "cross-referenc[ing] mileage records between the lease agreement,

7    bill of sale, warranty documentation, and the vehicle itself."  LNLA Oppo. [Dkt. No. 75] 4:1-10.

8    That is not how the discovery rule works.  He had reason to know of the "discrepancy" when he

9    gained possession of the paperwork bearing the conflicting mileage statements.  The statute of

10   limitations has run on his TIMA claim against LNLA.

### 2.    Intent to Defraud

12       Even if Uddin's TIMA claim was *not* time-barred, he has also not pleaded facts that show

13   LNLA acted with the requisite intent to defraud him as to the mileage on the Vehicle.  With

14   respect to this element, the Ninth Circuit has explained that

15       Congress did not want vehicle transferors to be liable under § 32710(a) when they acted
         without the requisite intent, even if their violations threatened the Act's remedial scheme.
16       Therefore, we should not construe § 32710(a) so as to create as much liability as possible.
         Rather, we must faithfully apply the section's limit on liability, even if it undermines the
17       statute's remedial purposes.

18   *Bodine*, 533 F.3d at 1153.

19       Uddin's TIMA claim lacks intent to defraud.  According to the SAC, "LNLA at all times

20   retained physical possession of the vehicle since arrival to the dealer on April 28, 2020," and its

21   vehicle handling "included the pre-delivery inspection process, and continuous access to the

22   vehicle from their decisions to additionally service and repair non-conformities found, as well

23   access to service records they generated from performing these processes." SAC ¶ 139.  Uddin

24   contends that LNLA "failed to verify and disclose accurate mileage at the outset and later

25   disregarded multiple notices of the discrepancy."  *Id.* ¶ 140.

26       These allegations do not support that LNLA acted with an intent to defraud Uddin

27   concerning the mileage on the Vehicle.  It provided him with two different mileage amounts at the

28   time of the lease, only ten miles apart.  None of this was hidden from him.  Those facts do not

14

United States District Court
Northern District of California

1    plausibly allege an intent to defraud.

2          Moreover, courts typically find intent to defraud when a transferor underestimates mileage

3    on an Odometer Disclosure Statement at the time of sale to drive up the value of the vehicle.  *See*

4    *e.g.*, *Haynes*, 917 F.2d at 453 ("[a] transferor of a vehicle may be found to have intended to

5    defraud if he had reason to know the mileage on the vehicle was *more* than was reflected by the

6    odometer or certification of the previous owner and nevertheless failed to take reasonable steps to

7    determine the actual mileage");  *Shore v. J.C. Phillips Motor Co.,* 567 F.2d 1364, 1366 (5th

8    Cir.1978) (per curiam) ("[W]here there has been a reduction in the odometer reading while the

9    vehicle is in the possession of a transferor, fraud is implied, in the absence of an explanation.");

10   *Terry v. Whitlock,* 102 F. Supp. 2d 661, 663 (W.D. Va. 2000) (finding intent to defraud when

11   transferor had constructive knowledge vehicle had been driven greater distance than amount

12   transferor certified).  Uddin offers no authority where intent to defraud is inferred from a

13   transferor listing an overestimated mileage amount on the Odometer Disclosure Statement.  That

14   is no surprise, because an overestimation would, in practice, drive *down* the value of a vehicle for

15   sale or lease, potentially taking money out of the lessor's pocket.

16         What Uddin describes is a clerical error, not fraud.  LNLA's motion to dismiss this claim

17   is GRANTED.

18         **B.      As Asserted Against Porsche**

19         Uddin's claim against Porsche (his loan servicer) is even less plausible.  Uddin alleges that

20   despite his telling Porsche that he had concerns about discrepancies in the odometer, Porsche did

21   not take "corrective actions" upon knowledge of "false mileage in their contracts and impending

22   lease end obligations that would cause injury to [Uddin]."  SAC ¶ 139(b).  But Uddin has not

23   pleaded facts supporting that Porsche ever concealed the correct odometer reading from him,

24   much less that it did so with an intent to defraud.  He does not allege that Porsche misrepresented

25   the mileage of his Vehicle, or even that it had reason to know what the odometer read.  Indeed,

26   Porsche never had physical possession of the Vehicle.

27         Uddin's complaint against Porsche arises from its failure to do more on his behalf to

28   address the problem, not from any pleaded intentional wrongdoing or misrepresentation on its

1    part. *See e.g.* SAC ¶ 183(d) ("During the lease term . . . [Porsche] . . . representatives . . . refused

2    to acknowledge their responsibilities to remedy the false and misrepresented odometer mileage on

3    lease and sale records (LNLA business operations had closed in 2020)").  That does not state a

4    claim under TIMA.

5    **II.    BREACH OF EXPRESS WARRANTY (CLAIMS TWO AND FOUR)**

6         Uddin purchased the Vehicle from LNLA and entered into a Lease Agreement (SAC Ex.

7    A), dated April 29, 2020, with the dealership.  SAC ¶ 9.  Because the Vehicle was new, the

8    manufacturer, ALA, provided a new car warranty to Uddin (SAC Ex. B, the "Warranty"), the

9    benefits of which were passed to Uddin through the Lease Agreement.  SAC ¶ 144.  The Warranty

10   forms the basis for Uddin's second and fourth claims.  Claim Two (asserted against ALA and

11   LNLA) asserts breach of the new car warranty in violation of the Song-Beverly Consumer

12   Warranty Act ("Song-Beverly Act"), the Magnusson Moss Warranty Act and section 2313 of the

13   California Commercial Code.  Claim Four (asserted against all defendants) asserts the same, but

14   solely under the Song-Beverly Act.[3], [4]

15         Section 2313 provides that express warranties by the seller are created as follows:

16              (a) Any affirmation of fact or promise made by the seller to the buyer
                which relates to the goods and becomes part of the basis of the bargain

17              creates an express warranty that the goods shall conform to the
                affirmation or promise.

18              (b) Any description of the goods which is made part of the basis of
                the bargain creates an express warranty that the goods shall conform

19              to the description.
                (c) Any sample or model which is made part of the basis of the bargain

20              creates an express warranty that the whole of the goods shall conform
                to the sample or model.

21   Cal. Com. Code § 2313.

22

23   ───────────────────

     [3] ALA argues that Claim Two is duplicative of Claim Four and asks that I dismiss it under Rule 8.
24   I will consider the plausibility of Uddin's allegations underlying Claim Two to the extent that they
     are asserted under the California Commercial Code and strike the duplicative Song-Beverly Act
25   claims because they mirror the allegations in Claim Four. *See Swartz v. KPMG LLP*, 476 F.3d
     756, 766 (9th Cir. 2007) (holding that a "duplicative" claim was "properly dismissed").  That said,
26   I will still consider the plausibility of Uddin's breach of express warranty claims asserted as they
     are under the Song-Beverly Act and Magnusson Moss Warranty Act; I will simply consider them
27   as part of Claim Four, not Claim Two.

28   [4] Claim Four also asserts breach of implied warranty under the Song-Beverly Act and Magnusson
     Moss Warranty Act.  I will address implied warranty claims later, in Section III.

United States District Court
Northern District of California

1    To successfully plead a claim for breach of express warranty under section 2313, the

2    buyer must allege that the seller "(1) made an affirmation of fact or promise or provided a

3    description of its goods; (2) the promise or description formed part of the basis of the bargain; (3)

4    the express warranty was breached; and (4) the breach caused injury to the plaintiff." *Blennis v.*

5    *Hewlett–Packard Co.*, No. C 07–00333, 2008 WL 818526, at *2 (N.D. Cal. Mar. 25, 2008)

6    (citation omitted). The claim must also describe the exact terms of the warranty, allege that buyer

7    reasonably relied on those terms, and that the breach of the warranty was the proximate cause of

8    the buyer's injury. *See id.*

9    The Song-Beverly Act was enacted to regulate warranties and strengthen consumer

10   remedies for breaches of warranty. *National R.V., Inc. v. Foreman*, 34 Cal. App. 4th 1072, 1076-

11   77 (1995). It is intended to protect purchasers of "consumer goods," defined as "any new product

12   or part thereof that is used, bought, or leased for use primarily for personal, family, or household

13   purposes, except for clothing and consumables." Cal. Civ. Code § 1791(a). It requires

14   "manufacturer[s] of consumer goods . . . for which the manufacture has made an express

15   warranty" to "[m]ake available to authorized service and repair facilities sufficient service

16   literature and replacement parts to effect repairs during the express warranty period." *Id.* at §

17   1793.2(a)(3) (emphasis added). Subsection (b) requires a manufacturer to "service[ ] or repair[ ]

18   goods" in conformance with "the applicable warranties within 30 days." *Id.* at § 1793.2(b).

19   To state a claim for breach of express warranty under the Song-Beverly Act, the plaintiff

20   must plead that: "(1) the vehicle had a nonconformity covered by the express warranty that

21   substantially impaired the use, value or safety of the vehicle (the nonconformity element); (2) the

22   vehicle was presented to an authorized representative of the manufacturer of the vehicle for repair

23   . . . ; and (3) the manufacturer or his representative did not repair the nonconformity after a

24   reasonable number of repair attempts[.]" *Guzzetta v. Ford Motor Co.*, No.

25   221CV09151MEMFPVCX, 2022 WL 18674949, at *3 (C.D. Cal. Nov. 29, 2022) (quoting *Donlen*

26   *v. Ford Motor Co.*, 217 Cal. App. 4th 138, 152 (2013)).

27       **A.      Breach of Express Warranty Pleaded Against ALA**

28   "A manufacturer's liability for breach of an express warranty derives from, and is

United States District Court
Northern District of California

measured by, the terms of that warranty; accordingly, the 'requirement[s]' imposed by an express warranty claim are not 'imposed under state law,' but rather imposed by the warrantor." *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1117 (C.D. Cal. 2021) (internal citations omitted). The Warranty identifies ALA as the warrantor and was provided to Uddin at the start of the Lease. *See* SAC Ex. B at p. 9.[5]  It covers Lamborghini vehicles, parts and accessories that are imported or distributed by Lamborghini America, and Lamborghini vehicles originally sold by an authorized dealer.  *Id.* at p. 10.  Its coverage period extends three years from the date specified in the Warranty Start Coupon, which "will be provided to [the buyer] when the vehicle is first delivered."  *Id.* at p. 6.

### 1.    Premature Warranty Start Date

Uddin alleges that ALA breached the terms of the Warranty when it began the new car warranty on January 5, 2020, which was "premature[]" to both "the vehicle's actual manufacture," its arrival as new vehicle to the dealer, and the start of the Lease. SAC ¶ 146(a).  The Warranty states under the subheading "What is the Coverage Period," that the coverage period "begins on the date the vehicle is delivered to either the original retail purchaser or original lessee."  *See* SAC Ex. B.  The Vehicle was delivered to Uddin, as the original lessee, on April 28, 2020, which plausibly constituted breach contract in violation of the Warranty's terms.

The problem with Uddin's express warranty claim against ALA, both under the California Commercial Code and the Song-Beverly Act, is damages.  To plausibly allege a section 2313 violation, a plaintiff must plead that "the breach caused *injury* to the plaintiff." *See Blennis*, 2008 WL 818526, at *2 (emphasis added).  Under the Song-Beverly Act, a plaintiff must plausibly allege, among other things, that "the vehicle had a nonconformity covered by the express warranty that *substantially impaired* the *use*, *value* or *safety* of the vehicle."  *Donlen v. Ford Motor Co*., 217 Cal. App. 4th 138, 152 (2013) (emphasis added).

Uddin has not identified how the premature warranty start date injured him or how it

---

[5] Uddin has not attached the full text of the Warranty to the SAC, only parts.  I will assume that he has provided all pages that are helpful to resolve his claims.

substantially impaired the use, value, or safety of the Vehicle. He does not claim that he ever paid out-of-pocket for warranty repairs during the last four months of the warranty period as it was, i.e. during the period between January 2023 (when the three-year new car warranty prematurely ended) to April 2023 (when Uddin believed the new car warranty was going to end, a date for which ALA eventually provided him an extension). In fact, Uddin does not plead that he paid out of pocket for *any* repairs.

Uddin contends that his damages included: (1) diminished warranty benefits, because "[t]he shortened coverage deprived Plaintiff of warranty protection for unresolved defects and nonconformities beyond its three-year expiration"; (2) loss of value and use, because "[t]he vehicle's defects and nonconformities, compounded by the premature warranty expiration, diminished its collectability, value, and intended use"; and (3) substantial effort and burden, because Uddin "expended significant time and effort attempting to resolve warranty issues caused by ALA's noncompliance." *See* Opposition to ALA Motion ("ALA Oppo.") [Dkt. No.72] 8-9. But he only alleged that in March 2023, he sought a three-year extension because he knew that the Warranty would soon expire, "leaving him without coverage to his increasing detriment." SAC ¶ 103. Due to the premature warranty start date, warranty coverage had ended four months before he sought the extension. But at that point, Uddin had not incurred any out-of-pocket expenses from the ongoing customer satisfaction efforts that ALA was engaging in with him.[6]

Uddin does not claim that he was forced to pay out of pocket for repairs between January 2023 and April 2023. He has not shown damages under section 2313 nor the Song-Beverly Act.

### 2.    Delivery in a State of Disrepair

Uddin also alleges that the Warranty was breached when the Vehicle was delivered to the dealership in an "improper state of repair." SAC ¶ 146(c). But the Warranty provides not that the Vehicle will be provided to the consumer in perfect condition, but rather that "[f]or the duration of the Lamborghini New Vehicle Limited Warranty, an Authorized Lamborghini Dealer will repair or replace, at Lamborghini America's discretion, without charge any parts and accessories that are

---

[6] In October 2023, ALA offered Uddin a one-year warranty extension in an attempt to resolve this dispute.

United States District Court
Northern District of California

covered by the Lamborghini New Vehicle Limited Warranty and that are found to be defective in materials or workmanship." SAC Ex. B, at p. 10. It does not contain a timeframe for these repairs to be made. The Warranty cannot be read as providing a cause of action for breach in the event of imperfect delivery.

### 3.    Other Purported Breaches

As for the other ways in which Uddin alleges ALA breached, they are not connected to express provisions within the Warranty, and he does not allege damages. *See e.g.* SAC ¶ 146(b) (alleging that the delay in delivery breached the new car warranty, but failing to identify an express provision of the Warranty that guaranteed on-time delivery); 146(e) (alleging that ALA failed to fully review and explain the terms of the new car warranty, but failing to show either damages or an express provision requiring that it fully review and explain the terms); 146(f) (alleging that the font size on the warranty violates "clear and conspicuous warranty term requirements of Cal. Civil Code § 1793.1 but failing to show damages); 146(i) (alleging that ALA failed to complete cosmetic repairs within the three-year warranty period, but failing to show that the express warranty contains a provision requiring that ALA cover the repairs he sought); 159(b) (alleging that ALA violated Cal. Civ. Code § 1793.1(a)(2) by "failing to provide . . . work orders and repair invoices" but failing to allege damages). The same allegations may serve as the basis for other claims against ALA, but not a breach of express warranty claim under section 2313. For these reasons, ALA's motion to dismiss Uddin's breach of express warranty claims is GRANTED.

### B.    Breach of Express Warranty Pleaded Against LNLA

There is no claim against LNLA for breach of express warranty. The Warranty that Uddin has attached to the SAC expressly defines the warrantor as "Lamborghini America," which the Warranty defines as "Automobili Lamborghini America, LLC." SAC Ex. B, at p. 6. LNLA cannot be liable for breach of a warranty to which it is not a party. Its motion to dismiss Uddin's breach of express warranty claims is GRANTED.

## III.    BREACH OF IMPLIED WARRANTIES (CLAIMS THREE AND FOUR)

Claim Three alleges that the defendants each breached the implied warranties of merchantability and fitness for a particular purpose, as set forth under the Song-Beverly Act and

1  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2300, *et seq*.[7], [8]

2      **A.**    **Implied Warranty of Merchantability**

3      The Song-Beverly Act "was enacted to regulate warranties and strengthen consumer

4  remedies for breaches of warranty." *Cholakyan v. Mercedes–Benz USA, LLC*, 796 F. Supp. 2d

5  1220, 1241 (C.D. Cal. 2011).  Thus, "[u]nless specific disclaimer methods are followed, an

6  implied warranty of merchantability accompanies every retail sale of consumer goods in the state."

7  *Id*.  The Song-Beverly Act provides that the implied warranty of merchantability means that the

8  "consumer goods" at issue: (1) pass without objection in the trade under the contract description;

9  (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately packaged

10  and labeled; and, (4) conform to the affirmations of fact included on the container or label.  *See*

11  Cal. Civ. Code § 1791.1(a).

12      California courts have held that under the Song-Beverly Act, the implied warranty of

13  merchantability "requires only that a vehicle be reasonably suited for ordinary use."  *Keegan v.*

14  *Am. Honda Motor Co*., 838 F. Supp. 2d 929, 945 (C.D. Cal. 2012).  "It need not be perfect in

15  every detail so long as it 'provides for a minimum level of quality.'" *Id*. (citation omitted); *see*

16  *also Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 (Cal. Ct. App. 1995)

17  ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of

18  merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the

19  vehicle unfit for its ordinary purpose of providing transportation.").

20      In line with this approach, courts have held that defects arising from aesthetic flaws or

21  annoying qualities do not give rise to a claim for breach of the implied warranty.  *See e.g.*,

22  *Barakezyan v. BMW of N. Am., LLC*, No. CV 16–00173 SJO (GJSx), 2016 WL 2840803, at *9–

23  _____

24  [7] Claim Four is stylized as a general Song-Beverly Act claim, and to the extent it asserts breach of
    implied warranty, it is grounded in the same facts as Uddin alleges in Claim Three.  Uddin

25  concedes that Claims Three and Four should be dismissed as to Porsche.  *See* Porsche Oppo. 6:3-
    5.

26  [8] California courts have held that the "substantive elements under the Magnuson-Moss [Warranty]

27  Act are the same as under state warranty law," meaning that analysis of the plausibility of claims
    brought under the Song-Beverly Act also applies to the plausibility of claims brought under the

28  MMWA. *See Barakezyan v. BMW of N. Am., LLC*, No. CV1600173SJOGJSX, 2016 WL 2840803,
    at *10 (C.D. Cal. Apr. 7, 2016).

1    *10 (C.D. Cal. Apr. 7, 2016) (dismissing implied warranty of merchantability claim where brakes

2    emitted "long, high-pitched noise" but the vehicle "provide[d] transportation from one point to

3    another and stop[ped]" effectively); *Resnick v. Hyundai Motor America, Inc.*, 2017 WL 1531192

4    (C.D. Cal. 2017) (no claim for breach of implied warranty of merchantability under Song-Beverly

5    Act where the plaintiffs alleged defects that affected only the aesthetics of the vehicle and did not

6    allege that it rendered the vehicle inoperable, useless, or unsafe).  A panel in the Ninth Circuit held

7    in *Troup v. Toyota Motor Corp.*, 545 Fed. App'x 668 (9th Cir. 2013), that the implied warranty of

8    merchantability is breached when the defect "drastically undermine[s] the ordinary operation of

9    the vehicle." *Id.* at 669.

10    Uddin's claim for breach of the implied warranty of merchantability is deficient because he

11    has not alleged that the defendants failed to repair the Vehicle such that it was rendered unsuitable

12    for ordinary use.  Any potentially qualifying damage to the Vehicle that did exist—i.e. its

13    difficulty starting when it arrived to the LNLA service center—was repaired by LNLA early on.

14    *See* SAC ¶ 22 (the "initial operational and electronic malfunctions hindering the new vehicle's

15    function and operation were eventually addressed over the course of weeks.").  What remain are

16    cosmetic problems or documentation errors.  While those problems may render the Vehicle

17    imperfect as a collector's item, a possibility that I discuss in the next section, they do not render

18    the Vehicle unfit for ordinary use.  All motions to dismiss this claim are GRANTED.

19    **B.    Implied Warranty of Fitness for a Particular Purpose**

20    "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser

21    at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time

22    of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's

23    skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at

24    the time of contracting has reason to know that the buyer is relying on such skill and judgment."

25    *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (Ct. App. 1985). "A particular purpose . . . envisages

26    a specific use by the buyer which is peculiar to the nature of his business[.]" *Am. Suzuki Motor*

27    *Corp. v. Superior Court,* 37 Cal.App.4th 1291, 1295 n. 2 (1995) (internal quotation marks

28    omitted).  To state a claim for breach of the implied warranty of particular purpose, the plaintiff

United States District Court
Northern District of California

must identify a particular purpose for which he obtained the product at issue.  *See Smith v. LG Elecs. U.S.A., Inc.*, No. C 13–4361 PJH, 2014 WL 989742, at *8 (N.D. Cal. Mar. 11, 2014).

Uddin claims that representatives from both the dealership, LNLA, and the manufacturer, ALA, knew that he had a particular purpose for the Vehicle, and knew what that particular purpose was: he intended to use it as a high-value collector's item.  The same representatives also allegedly knew that he was relying on their expertise to select the Vehicle.  *See* SAC ¶¶ 12, 152.  These allegations are plausible.

According to the SAC, Uddin worked for weeks with representatives from both ALA and LNLA, discussing what specifications his car would have, explaining to them that he was a car collector, and stating that he intended to "use this vehicle as a collectible vehicle." SAC ¶ 152.  He did this before he purchased the Vehicle.  *See e.g.*, *id.* ¶ 12 ("Due to limited information about the limited production model's details being available to LNLA at the time, [LNLA General Manager] Giger arranged for a meeting between ALA and Uddin on or around August 17, 2019, at 2019 Monterey Car Week at Pebble Beach, CA.  The purpose of this meeting, and subsequent correspondences was for ALA to assist Plaintiff in selecting specific options, customization, and a configuration in line with Plaintiff's particular purpose to create a unique collectible vehicle maximizing investment value, long-term appreciation, collectability, factory original provenance, and enjoyment"); *id.* ¶ 152(b) ("In [the meeting during Monterey Car Week], ALA was aware that Plaintiff as a car collector intended to use this vehicle as a collectible vehicle, and relied on ALA's skill and judgement to choose specifications in order to maximize the vehicle's collectability, value, future appreciation, provenance, and preservation of its new and pristine factory built condition.").

Uddin plausibly relied on the expertise of ALA and LNLA personnel with whom he was working.  *See id.* ¶ 12 ("Given ALA's unique position as the vehicle's designer, manufacturer, and customization authority, ALA's expertise and knowledge of all possible offerings was critical in order to inform and guide Plaintiff for selecting a final configuration for the vehicle.  The goal of this meeting and subsequent correspondence was to make sure Uddin's customization and

experience a flawless embodiment of his automotive aspirations.").[9]  At the meeting with ALA

representatives on August 17, 2019, Uddin explained that he was "a car collector" and explained

that he intended to add the Vehicle to his collectible car collection.  *Id.* ¶ 13.  Together, Uddin and

ALA then identified a car that Uddin liked and decided to "replicate the show car's exquisite

interior design specifications," which were to compliment his "unique collectible vehicle."  *Id.*

Uddin alleges that throughout 2018 and 2019, "guided and advised by Giger," he frequently

discussed the Vehicle's value to him as a "highly collectible" vehicle being added to his

collection.  *Id.* ¶ 15.

Uddin's claim for breach of the implied warranty of fitness for a particular purpose may

proceed against ALA and LNLA.  The motions to dismiss this claim are DENIED.

## IV.    THE TORT CLAIMS (CLAIMS FIVE THROUGH NINE)

Uddin does not dispute that he seeks only economic damages against all defendants for his

tort claims (Claims Five through Nine).  Economic losses are "damages for inadequate value,

costs of repair and replacement of the defective product or consequent loss of profits – without any

claim of personal injury or damages to other property." *Sacramento Reg'l Transit Dist. v.*

*Grumman Flxible*, 158 Cal. App. 3d 289, 294 (1984) (citation and internal quotation marks

omitted).  Typically, as defendants argue here, the economic loss rule applies to preclude recovery

in tort where damages are purely economic.  *See Jimenez v. Superior Court*, 29 Cal. 4th 473, 481-

484 (2002).  But the doctrine has exceptions: "[i]n the absence of (1) personal injury, (2) physical

damage to property, (3) a 'special relationship' existing between the parties, or (4) some other

common law exception to the rule, recovery of purely economic loss is foreclosed." *See J'Aire*

*Corp. v. Gregory*, 24 Cal. 3d 799 (1979).

### A.    Tort Claims Against ALA

Uddin argues that there exists a "special relationship" between himself and ALA, which

---

[9] The defendants are correct that Claims Three and Four are duplicative. To the extent that Uddin proceeds with his claim for breach of the implied warranty of fitness for a particular purpose against ALA and LNLA, he should assert it as one claim, arising under Cal. Civ. Code § 1791.1(b).

United States District Court
Northern District of California

1    imposed a duty of care on ALA that relieves Uddin of the typical burden of pleading non-

2    economic losses for such claims.  He argues that the duty "arose from ALA's specific roles as

3    distributor, manufacturer, and corporate entity responsible for customer service and aftersales

4    support in the U.S., distinct from its specific obligations as warrantor of the express new car

5    warranty."  SAC ¶ 165.

6        Uddin describes the elements of this purportedly "special relationship" as follows: "ALA's

7    corporate customer service and aftersales functions were intended to directly affect and benefit

8    Plaintiff, as Plaintiff relied on these functions to enjoy and preserve his vehicle's integrity and

9    value; (2) ALA's failures and neglect of these responsibilities foreseeably risked harm to Plaintiff;

10   (3) Plaintiff suffered direct injury due to ALA's conduct, including losses to vehicle value,

11   integrity, use, and time; (4) a close connection exists between ALA's failures in customer service,

12   aftersales, and corporate conduct, and the resulting losses suffered by Plaintiff; (5) ALA's

13   repeated failures and neglect of Plaintiff's issues and concerns reflects morally blameworthy

14   conduct; and (6) imposing a heightened duty here supports public policy by setting example for

15   responsible behavior and deterring negligent conduct in similar transactions." SAC ¶ 166.

16       The factors Uddin lists mirror exactly the six-part "special relationship" test laid out by the

17   California Supreme Court in *See J'Aire Corp. v. Gregory*, 24 Cal. 3d 799 (1979).  But this test

18   does not apply to Uddin and ALA because they have a direct contractual relationship.

19       *Elsayed v. Maserati North America, Inc.*, 215 F. Supp. 3d 949 (C.D. Cal. 2016) is

20   instructive on this issue.  There, Elsayed made the same argument against Maserati as Uddin does

21   against ALA.  But the court rejected Elsayed's position, saying that he misunderstood the special

22   relationship exception: "The underlying purpose of the special relationship exception is to define

23   particular 'circumstances in which a party has a duty of care to avoid imposing economic losses on

24   third parties.'" *Elsayed*, 215 F. Supp. 3d at 963; *see also Mega RV Corp. v. HWH Corp.*, 225 Cal.

25   App. 4th 1318, 1340 (Cal. Ct. App. 2014) (holding that the special relationship exception applies

26   when the court is required to analyze "the circumstances in which a party has a duty of care to

27   avoid imposing economic losses *on third parties*.") (emphasis in original).  Such a special

28   relationship does not exist between directly contracting parties, like Elsayed and Maserati and like

Uddin and ALA.

The *Elsayed* court explained that if courts applied the first, second, and fourth *J'Aire* factors between directly contracting parties, the test would almost always find a special relationship between them. *See J'Aire*, 24 Cal. 3d 799 (articulating six-factor special relationship test). The transaction would always be intended to affect the plaintiff, the harm would almost always be foreseeable, and the connection between the defendant's conduct and the plaintiff's economic injury would be, by definition, close. The special relationship exception is supposed to be narrow; applying the *J'Aire* test to relationships between directly contracting parties would impermissibly broaden it.

The new car warranty (SAC Ex. B) constitutes a direct contract between Uddin and ALA. Courts in this circuit have held that where consumers and car manufacturers are parties to a warranty, they are directly contracted, such that no "special relationship" arises. *See e.g.*, *Resnick v. Hyundai Motor Am., Inc.*, No. CV1600593BROPJWX, 2017 WL 1531192, at *2 (C.D. Cal. Apr. 13, 2017) (special relationship exception does not apply because the plaintiff was not a third party to the transaction but had a direct contractual relationship with the defendant manufacturer via the express warranty) (citing *Elsayed*, 215 F. Supp. at 96). The relationship between Uddin and ALA is not the kind of narrowly construed special relationship that allows a plaintiff to assert tort claims without asserting non-economic losses. Uddin's tort claims against ALA fail for want of non-economic damages.[10] ALA's motion to dismiss the tort claims against it is GRANTED.[11]

_____

[10] Uddin argues that because he and ALA are not in privity of contract, they cannot be in a direct contractual relationship. As ALA points out, Uddin has cited no authority that parties must be in contractual privity to be in a direct relationship with one another, and there is authority to the contrary.

[11] Even if the "special relationship" rule did apply and the economic loss rule did not bar Uddin's claims against ALA, his sixth and eighth claims, which allege "misrepresentations and omissions" and "fraud and deceit," respectively, fail because he has not alleged facts to support a fraud claim under Rule 9(b). Uddin's allegations illustrate an ongoing back-and-forth between the two parties, where ALA attempted to meet Uddin's expectations about the Vehicle's specifications and Uddin expressed his dissatisfaction with its efforts. ALA's failure to fulfill his expectations for the Vehicle, even after its assurances that it could and would fulfill those expectations, do not amount to intentional misrepresentation or fraud. *See e.g.*, *UMG Recordings, Inc. v. Global Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092 (C.D. Cal. 2015) ("Mere nonperformance of a promise does not suffice to show the falsity of the promise."); *see also Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991) (holding that misrepresentation is only actionable if it pertains to "past

United States District Court
Northern District of California

**B.      Tort Claims against LNLA**

The economic loss rule also recognizes exceptions for independent duties, negligent performance, misrepresentations and fraud.  Uddin argues that the economic loss rule does not bar his claims against LNLA because his claims against it arise from duties that are independent from the Lease, arising instead from LNLA's general duties as a seller.

Not so.  Uddin's tort claims rely on the same facts as his claims against LNLA that *do* arise from the contractual relationship he had with the dealership.  The economic loss rule provides that "no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *JMP Sec. LLP v. Altair Nanotechnologies Inc*., 880 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (citation omitted). "This rule serves to prevent every breach of a contract from giving rising to tort liability and the threat of punitive damages." *Id.*  I have already explained why his TIMA claim fails; to the extent he seeks to impose tort liability on LNLA for the same underlying facts, that claim would fail because he has not pleaded facts showing that LNLA intended to defraud him.  LNLA's motion to dismiss Uddin's tort claims is GRANTED.

**C.      Tort Claims Against Porsche**

Uddin's tort claims against Porsche also fail, for the same reasons outlined above.  They are barred by the economic loss rule because they are based on the same facts as his non-tort claims against Porsche.  *See JMP Sec. LLP*, 880 F. Supp. 2d at 1042 (the economic loss rule provides that no tort cause of action lies where the breach of duty is synonymous with a contractual promise).  His misrepresentations and omissions claim, to the extent that it is asserted against Porsche, relies on the same facts as his TIMA claim against the same defendant: Uddin simply alleges that Porsche failed to correct the mileage discrepancy between the Lease and the Vehicle's odometer.  *See* SAC ¶ 172(e).  His claim for fraud against Porsche alleges the same, but states that Porsche "intention[ally]" refused to correct the issue.  *Id.* ¶ 183(d).  Porsche's motion to dismiss Uddin's tort claims against it is GRANTED.

---

or existing material fact . . . . [P]redictions as to future events . . . are deemed opinions, and not actionable fraud.").

United States District Court
Northern District of California

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the motions to dismiss are GRANTED with respect to all claims except Uddin's claim for breach of the implied warranty of fitness for a particular purpose, which may proceed against both ALA and LNLA. As no cognizable claims remain against it, Porsche is dismissed from the case.

A further Case Management Conference is set for March 11, 2025, at 2:00 p.m. The parties' Joint Statement is due March 4, 2025.

**IT IS SO ORDERED.**

Dated: February 11, 2025



William H. Orrick
United States District Judge