I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SALAH UDDIN,

Plaintiff,

v.

AUTOMOBILI LAMBORGHINI AMERICA, LLC, et al.,

Defendants.

Case No. 24-cv-02532-WHO

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT, JOINDER, AND SEALING MOTIONS**

Re: Dkt. No. 102, 113, 123

Defendants Automobili Lamborghini America, LLC ("ALA") and Boardwalk Automobiles Palo Alto, LLC f/k/b/a Lamborghini North Los Angeles ("BAPA") (collectively, "defendants") move for summary judgment on plaintiff Salah Uddin's ("Uddin") breach of implied warranty for a particular fitness claim.[1] The issue is how to define the "particular fitness" covered by the warranty—is it the vehicle type, which qualifies as a collectible, or is it a collectible as defined by the purchaser, Uddin? I conclude that the Subject Vehicle as delivered by ALA did not breach the implied warranty for a particular purpose. I also conclude that Uddin's grievances are not cognizable under that implied warranty, and that ALA did not have equal or superior knowledge

[1] While not an original party to the motion, BAPA moved for joinder to ALA's motion for summary judgment. That motion is GRANTED. "When reviewing whether to allow a party to join in a motion, the court will allow the joinder when either (1) the parties are so similarly situated that filing an independent motion would be redundant, or (2) the party seeking joinder specifically points out: which parts of the motion apply to the joining party, the joining party's basis for standing, and the factual similarities between the joining party and the moving party that give rise to a similar claim or defense." *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1151 (C.D. Cal. 2016). BAPA has met its burden under the first prong. As noted in its motion, "[f]or purposes of the implied warranty of fitness for a particular purpose the retail seller and distributor fall into the same category." Motion for Joinder [Dkt. No. 113]; *see* Cal. Civ. Code § 1792.2(a) (indicating that implied warranty for particular purpose claims cover both "retailer[s] [and] distributor[s]"). Because the arguments presented by ALA apply equally to BAPA, the parties are "similarly situated" to the point where "filing an independent motion would be redundant." *Tatung, Co., Ltd.* 217 F. Supp. 3d at 1151. For the purposes of summary judgment, BAPA's liability rises and falls with ALA. Because ALA took the leading oar on the motion, I refer primarily to ALA in the body of this Order. BAPA gets the benefit of its arguments.

United States District Court
Northern District of California

or skill to make the Subject Vehicle into something that would satisfy Uddin. The primary unresolved issue Uddin has identified with the Subject Vehicle, whether his leasing documents incorrectly listing the odometer reading as 40 miles instead of 30 miles, is insubstantial in any event. Defendants' motion for summary judgment is GRANTED.[2]

## BACKGROUND

### 1. Factual Background

This case concerns Uddin's purchase of the 2020 Lamborghini Aventador SVJ Roader (the "Subject Vehicle"). Declaration of Shaun Kim in Support of Motion for Summary Judgment ("Kim Decl.") Ex. D (Deposition Transcript of Salah Uddin ("Uddin Decl.")) at 42:17–19. The Subject Vehicle is, according to Uddin, an "exclusive limited production collectible model." Second Amended Complaint ("SAC") [Dkt. No. 65] ¶¶ 2–3. Uddin describes himself as a "car enthusiast and car collector" who owns numerous vehicles, including "limited production special interest vehicles." Declaration of Salah Uddin in Opposition to Motion for Summary Judgment ("Uddin Decl.") [Dkt. No. 106-1] ¶ 2.

The Subject Vehicle is an "allocation-based, custom build to order vehicle" that "could not simply [be] pick[ed] 'off the lot.'" Uddin Decl. ¶ 6. Accordingly, to purchase the Subject Vehicle, individuals must have a "relationship with the dealer" and have "previous [and] current Lamborghini ownership history." *Id.* Uddin began his search for a new vehicle for his collection in 2018, tendering an initial deposit around June 15, 2018, for a new vehicle. Uddin Dep. at 55:21–56:12, 66:8–17. Uddin's conversations in 2018 were "limited to the dealer at that point," as he did not discuss the Subject Vehicle with ALA. *Id.* at 67:3–7.

---

[2] Uddin also filed a motion to consider whether ALA's material should be sealed pursuant to Civil Local Rule 79-5(f). *See* Dkt. No. 123. ALA filed its required response. *See* Dkt. No. 127. ALA seeks to keep under seal various portions of its Warranty Policy and Procedural Manner that Uddin briefly cites in his March 4, 2026 supplemental brief (Dkt. No. 124). *See* Declaration of Rene Sueltzner in Response to Plaintiff's Administrative Motion ("Suetlzner Decl.") [Dkt. No. 127] ¶¶ 5–6; Dkt. No. 123-1 (exhibits). Because Uddin cites the Warranty documents in support of its motion for summary judgment, the "compelling reasons" standard for sealing applies. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006). After reviewing the exhibits, I agree with ALA that such documents are "economically valuable to ALA and potentially to its competitors who must develop and maintain their own processes, policies, and procedures with its own authorized dealerships." *See* Suetlzner Decl. ¶ 6. Accordingly, the request to seal is GRANTED.

United States District Court
Northern District of California

Uddin met with ALA for the first time at Monterey Car Week ("Car Week") in August 2019 to discuss the Subject Vehicle. *Id.* at 67:8–16. His conversations with ALA focused on the customization process of the Subject Vehicle through Lamborghini's Ad Personam Program, a "vehicle customization program" that "allows a customer to personalize certain aesthetic aspects of their vehicles," including "colors, materials, and finishes for both the exterior and interior of the[ir] vehicles." *Id.* at 67:8–16; Declaration of Matt McKown ("McKown Decl.") [Dkt. 102-2] ¶¶ 5–6. ALA maintains that "Ad Personam personnel may make recommendations or suggestions regarding available options for the vehicle," but ultimately "final configuration decisions are made solely by the customer." *Id.* ¶ 7.

Uddin alleges that during the Ad Personam process, he "communicated [with ALA] that [he] was a car collector and that [he] intended to collect and preserve the [Subject] Vehicle as a collectible vehicle in [his] collection, and not to drive it as a normal daily-use car." Uddin Decl. ¶ 5. Specifically, Uddin alleged during the litigation that his particular purpose for the Subject Vehicle was:

> Plaintiff's PARTICULAR PURPOSE would be that the SUBJECT VEHICLE would arrive with the manufacturer's original factory specifications and quality control standards and requirements at production, pre-delivery inspection, and delivery; be optioned and customized as agreed in the design and order process; have numbers matching; and have the SUBJECT VEHICLE's factory original provenance intact.

Kim Decl., Ex. B (Rog. No. 19). He says that he "relied on ALA's and its representatives' knowledge, expertise, and judgment regarding the [Subject] Vehicle's options, equipment, customization content, feasibility, and resulting exclusivity." Uddin Decl. ¶ 7. He adds that he relied on ALA to "(a) inform [him] what configurations and Ad Personam options were possible or feasible; (b) accurately capture and configure the content of [his] chosen build; and (c) submit, approve, and lock the configuration in a way that reflected what [they] had agreed." *Id.* ¶ 9.

When Uddin began the ordering process with ALA, he did not "expressly inform ALA personnel that the subject vehicle should be delivered in factory original condition" or should contain certain features such as "numbers matching"; he believes that it was "implied" given his status as a collector. Uddin Dep. at 204:7–16; 206:3–14; *see also id.* at 205:12–206:2 ("So at the

time [around August 2019] . . . [ALA] knew that I wanted a new vehicle built by the factory. So the allocation entitled me to having such a vehicle. So at that part, you know, expressly saying that it needs to be 100 percent factory original when I believe new is exactly 100 percent original and also for the meeting the manufacturer's specifications and quality control standards and requirements, those also kind of go into that production process of the factory. So again, I would say that those are implied, but I feel that that's exactly part of the production construction that, you know, that's entitled from such an order.").

The Ad Personam customization process lasted months, with the final build sheet being submitted by Ron Giger, then-general manager of Lamborghini of North Los Angeles, on October 23, 2019. Uddin Dep. at 76:4–9, 87:16–88:2. On April 28, 2020, the Subject Vehicle was delivered to Lamborghini of North Los Angeles. Uddin Dep. at 98:19–101:17. Uddin traveled from the Bay Area to Los Angeles to receive and inspect the Subject Vehicle. Uddin Decl. ¶ 14. When the vehicle arrived, it "wouldn't run" and "had to be pushed in." Uddin Dep. at 100:1–7. Uddin noticed that the "engine cover had chips and gouges in the finishes around it," prompting "more attention to other things" he believed were deficient. *Id.* at 103:13–23. Further inspection revealed that there were "all sorts of problems with [the authenticity labels] where they were missing numbers and other stuff . . . [and were] damaged[3] and not in full effect itself." *Id.* at 104:10–16.[4] He also found that the Subject Vehicle was "missing the carbon skin interior feature," which Uddin had requested as early as Car Week. *Id.* at 278:4–22. Uddin was "very disappointed and unhappy" with the state of the Subject Vehicle as, in his view, "authentic factory original labeling and all this stuff is a direct measure [of] collectability." *Id.* at 105:10–14.

Uddin returned to inspect the Subject Vehicle again at the Lamborghini North Los Angeles (now BAPA) service center on August 29, 2020. *Id.* at 106:24–107:1, 107:18–21. He intended

[3] Uddin notes that there was "like black material on like one-half of [the labels] where it was kind of covered overspray," and that "a bunch of numbers, maybe over roughly a third of it, was wiped off" on the other side. Uddin Dep. at 109:19–110:1.

[4] Uddin suggests that "important to body panels are . . . [the authenticity label] stickers that prove . . . traceability [and] authenticity[.] This is how vehicles and their originality is measured and preserved." Uddin Dep. at 104:5–9.

for this visit to allow for a "little bit more of a visual inspection . . . after sleeping on it and calming down a little bit about the matter." *Id.* at 106:5–19. That inspection revealed that the "rubber trim and a few other things . . . were either damaged or subpar on the vehicle," as well as damage to the Subject Vehicle's multi-media interface ("MMI"). *Id.* at 110:21–24; 111:14–112:1; 113:16–20.

Notwithstanding the issues he identified with the Subject Vehicle during the two inspections, Uddin signed a lease agreement on April 29, 2020. *Id.* at 117:17–24. He did so because he was "repeatedly assured that ALA and [BAPA] would repair nonconforming items, address damage, and provide documentation so that the Vehicle's originality and authenticity would be preserved, including a factory letter about the engine cover work." Uddin Decl. ¶ 15; *see* Plaintiff's Response to BAPA's Motion for Joinder to ALA MSJ [Dkt. No. 117] at 3–4 ("[BAPA] personnel provided promises and assurances in connection with the observed damage and for preparing the Vehicle for retail sale, knowing Plaintiff's purpose . . . [BAPA] was at all times responsible for completing the manufacturer's required Pre-Delivery Inspection and preparing the Vehicle for retail sale, and for performing [BAPA's] promises and assurances (and ALA's obligations) on which Plaintiff relied."). He says that ALA "urged [him] to proceed with the transaction despite the observed issues." *Id.* ¶ 16.; *see* Uddin Dep. at 124:18–24 ("I did not have to [enter the lease], but based on the suggestion [by Giger and ALA], you know, we spent many years to get to that point, and nobody was offering me to get another new car that could take over six to eight months or actually shortly after, maybe a year, to build if you can even get allocation. At that time this was based on trust and the information that was being presented to me.").

After the lease was executed, ALA continued to respond to Uddin's concerns. "By mid-June 2020, plans were finalized by Giger to replace the engine cover to the detailed standards discussed." SAC ¶ 25. The reworked engine cover was eventually "completed and ready to ship along with new authenticity labels" by February 2021. *Id.* ¶ 49. On March 20, 2021, Uddin inspected the engine cover after it was delivered. *Id.* ¶ 58. He noted "a series of defects" on the Subject Vehicle, including "blemishes on the engine cover's finishes, inaccuracies to the details of

the factory finishes, numerous scratches into the new glass panel, erroneous engine cover and locks authenticity labels, uncoded locks to the car, additional other scratches, and authenticity labels now missing from the emergency door handle cover." *Id.* ALA continued to engage with Uddin between March and September 2021, despite his increasingly difficult requests, to provide an engine cover that met his expectations. *See id.* ¶¶ 59–85.

ALA similarly worked with Uddin to reproduce the Subject Vehicle's authenticity labels in July 2021. *See id.* ¶ 78; *see also id.* ¶ 85 (recognizing authenticity labels for the engine cover were complete); ¶ 92 (outlining plan for addressing remaining authenticity label issues on April 19, 2022). It also worked to assuage Uddin's concerns regarding the missing carbon skin interior feature. *See id.* ¶ 49 (ALA promising to look into the carbon skin issue on February 5, 2021); ¶ 80 (relaying to Uddin that "confirmation from the factory was pending on understanding a retrofit option for the carbon skin that could potentially address some of the interior problems").

Shortly before the end of the lease term, Uddin discovered that BAPA recorded the Subject Vehicle's mileage as 40 miles on the lease contract and the bill of sale paperwork. *See* SAC ¶ 139; *id.* Ex A (Lease Agreement). Another service record entitled "Cupón A 1500 mls (2500km)" indicated that the Subject Vehicle had 30 miles that same day. *Id.* Ex. B (Cupón A 1500 mls (2500km) Paperwork). Uddin confirmed that the Subject Vehicle actually had 30 miles on it on April 29, 2020, and that the odometer has increased to 31 miles due to him "backing in or out [and] moving it to be able to get other vehicle out" of his garage. Uddin Dep. at 161:11–162:8. He became concerned about the odometer discrepancy's impact on the Vehicle's value and calls this a "significant discrepancy." *Id.* ¶¶ 116-118. That issue remains.

After the lease term ended around June 2024, Uddin purchased the Subject Vehicle to "protect [his] massive amount invested into [the] vehicle." *See* Uddin Dep. at 126:6–21. He has decided not to perform many types of maintenance because of this lawsuit, claiming he has "gone into a frozen period." *Id.* at 199:18–200:2.

**2. Procedural History**

Uddin originally filed this lawsuit against ALA, Porsche Financial Services, Inc. d/b/a Lamborghini Financial Services, BAPA, and O'Gara Coach Company, LLC on April 26, 2024,

United States District Court
Northern District of California

raising numerous causes of action under California contract and consumer protection laws. *See* Complaint [Dkt. No. 1]. I granted defendants' motion to dismiss on all claims except for Uddin's implied covenant of fitness for a particular purpose. *See* Order Granting Motion to Dismiss [Dkt. No. 83]. As this case progressed, I warned the parties that they did not appear to be conducting necessary discovery in accordance with the case schedule. March 2025 CMC, [Dkt. No. 91]. Also, LNLA went out of business, and Porsche Financial Services and O'Gara Coach Company were dropped as defendants to this matter: only ALA and BAPA remained.

On November 12, 2025, ALA moved for summary judgment. *See* Motion for Summary Judgment [Dkt. No. 102] ("Mot."). Uddin responded, *see* Opposition to Motion for Summary Judgment [Dkt. No. 106] ("Oppo."), and ALA replied. *See* Reply to Opposition to Motion for Summary Judgment [Dkt. No. 108] ("Repl."). I heard oral argument on December 17, 2025, where it became clear that the parties were not ready for summary judgment. For one thing, BAPA had not joined ALA's motion, which made no sense given the claims in the case. I ordered it to file a motion for joinder by January 9, 2026, should it find that ALA's pending motion would resolve its case. More importantly, I learned that ALA had not met its discovery obligations to Uddin. I ordered ALA to produce "all records, communications, and other documents it ha[d] in its possession related to Mr. Uddin and the subject vehicle, including standards for the vehicle as of the date of the lease." *See* Civil Minutes for December 17, 2025 [Dkt. No. 111]. I set a further CMC on January 27, 2026 to resolve any remaining discovery disputes, as well as to consider whether discovery needed to be reopened in light of the new document productions and whether additional briefing was necessary on the motion for summary judgment.

ALA then produced the required documents, and on January 8, 2026, BAPA filed its motion for joinder to ALA's motion for summary judgment. *See* Joinder Motion ("Joinder Mot.") [Dkt. No. 113]. Uddin responded on January 23, 2026. *See* Opposition to BAPA's Motion for Joinder ("Joinder Oppo.") [Dkt. No. 117]. On January 26, 2026, the parties identified additional discovery disputes in a jointly filed letter. *See* Joint Discovery Letter Between Uddin and ALA [Dkt. No. 118]. I addressed these concerns at the parties' February 4, 2026 CMC, concluding that Uddin's arguments were untimely. *See* Civil Minutes for February 4, 2026 [Dkt. No. 121]. In

United States District Court
Northern District of California

addition, I permitted Uddin to file a supplemental brief of no more than ten pages in opposition to the motion for summary judgment to consider and use the additional documents he had finally obtained from ALA. *Id.*

Uddin filed his supplemental brief on March 4, 2026, along with new exhibits. *See* Supplemental Brief re Opposition/Response to Motion ("Supp. Oppo.") [Dkt. No. 124]; Exhibits re Administrative Motion to Consider Whether Another Party's Material Should be Sealed ("Uddin Supp. Ex.") [Dkt. No. 126]. ALA and BAPA both filed supplemental replies. *See* Response to Plaintiff's Supplement to Opposition ("ALA Supp. Repl.") [Dkt. No. 128]; Sur Reply re Joinder Motion for Summary Judgment ("BAPA Joinder Repl."). I then heard renewed oral argument.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Uddin's only remaining claim is for a breach of the implied warranty of fitness for a particular purpose. "Unlike express warranties, which are contractual in nature, implied warranties arise by operation of law." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 876–77 (N.D. Cal. 2015) (cleaned up). Both parties agree that an implied warranty of fitness for a particular purpose "arises only when (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985).

I first discuss whether Uddin's claim is time-barred and the law governing this dispute. I agree with Uddin that his case is not time-barred and that the Song Beverly Consumer Warranty Act ("SBWA") applies to his claim. I then address why Uddin's breach of the implied warranty for a particular purpose fails as a matter of law.

**I. Statute of Limitations**

Under Section 2725 of the California Commercial Code, any "action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Cal. Comm. Code § 2725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . ." *Id.* § 2725(2).

ALA asserts that the alleged breach occurred on April 28, 2020, when Uddin "first identified issues with the Subject Vehicle that he believed rendered it unfit for his intended purpose." Mot. at 14. As Uddin states in his opposition, however, the California Commercial Code's statute of limitations begins to run "when tender of delivery is made." Oppo. at 18. The Subject Vehicle was delivered to Uddin on May 22, 2020. *Id.* He filed suit on April 24, 2024, placing him within the four-year statute of limitations period. *See id.* While I dismissed his Amended Complaint, Uddin filed his Second Amended Complaint within the requisite period.

Mot. at 15 (citing *Halley v. Target Corp.*, No. SACV 17-692 JGB (MRWX), 2017 WL 11835629, at *6 (C.D. Cal. June 1, 2017) ("the statute of limitations will continue to run after dismissal."); Oppo. at 18. Accordingly, Uddin's claim was not time-barred by the four-year statute of limitations period and does not independently warrant granting summary judgment in ALA's favor.

**II. Applicable Law**

The parties dispute whether the California Commercial Code or the SBWA governs this dispute. Section 2316(3)(b) of the California Commercial Code, adopted from the Uniform Commercial Code ("UCC"), states in relevant part:

> [When a] buyer before entering into [a] contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

Cal. Com. Code § 2316(b)(3). Under the SBWA, however:

> Every sale of consumer goods that are sold at retail in this state by a retailer or distributor who has reason to know at the time of the retail sale that the goods are required for a particular purpose, and that the buyer is relying on the retailer's or distributor's skill or judgment to select or furnish suitable goods shall be accompanied by such retailer's or distributor's implied warranty that the goods are fit for that purpose.

Cal. Civ. Code § 1792.2(a). The SBWA also dictates that "no implied warranty of fitness shall be waived, except in the case of a sale of consumer goods on an 'as is' or 'with all faults' basis . . ." Cal. Civ. Code § 1792.3.

ALA maintains that the California Commercial Code applies, and that because Uddin "inspected the Subject Vehicle *twice* before entering into the Lease Agreement," he has waived any claim for an implied warranty of fitness for a particular purpose. Mot. at 7. Uddin, in turn, asserts that ALA's reference to the California Commercial Code is "flawed and inapplicable" as it "do[es] not govern a [SBWA] consumer transaction." Oppo. at 5.

"While the Song-Beverly Act is similar to the California Commercial Code, the Song-Beverly Act was intended to 'provide greater protections and remedies for consumers' than the Commercial Code." *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 921 (C.D. Cal. 2010)



United States District Court
Northern District of California

(quoting *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (Ct. App. 2009)). The SBWA "supplements, rather than supersedes, the provisions of the California Commercial Code." *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 213 (1991). But "to the extent that the [SBWA] gives rights to the buyers of consumer goods, it prevails over conflicting provisions of the Uniform Commercial Code." *Mexia*, 174 Cal. App. 4th at 1304 (internal quotations omitted).

The Subject Vehicle is a consumer good within the meaning of the SBWA. *See* Cal. Civ. Code § 1791(a) (defining "consumer goods" as "any new product or part thereof that is used, bought, or leased primarily for personal, family, or household purposes, except for clothing and consumables."). *Cf. Parker v. Alexander Marine Co. Ltd.*, No. [], 2015 WL 12712083, at *5 (C.D. Cal. May 26, 2015) (finding "custom-made goods," including "yachts, boats, or motor vehicles," to count as consumer goods under the SBWA). The SBWA applies. And because Uddin never received any "as is" or "with all faults" disclosures from defendants regarding the Subject Vehicle, his implied warranty of fitness claim is not barred. That Uddin inspected the vehicle twice prior to leasing it does not mean that the SBWA is rendered moot. Rather, because the SBWA and California Civil Code reasonably appear to conflict on this issue, the SBWA's provisions "prevail[.]" *Krieger*, 234 Cal. App. 3d at 213. Even if these provisions are not read as conflicting, the "strongly pro-consumer" policy of the SBWA suggests the outcome would nonetheless be the same. *Mexia*, 174 Cal. App. 4th at 1303–04.

Accordingly, because Uddin raises his implied warranty of fitness for a particular purpose claim under the SBWA, his election to enter into the lease agreement despite observing the alleged conditions of the Subject Vehicle is not fatal to his claim.

## III. Collectability

ALA maintains that summary judgment is warranted because "the Subject Vehicle was reasonably fit for Plaintiff's intended use as a collectible." Mot. at 9. To prevail on a claim for an implied warranty of fitness for a particular purpose, the plaintiff must establish that "(1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the

seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985). Because Uddin has failed to establish that he has a cognizable particular purpose or that ALA had the requisite skill and judgment to provide a Subject Vehicle that met his particular purpose, summary judgment is warranted.

**A. Particular Purpose**

The central question is how to define the particular purpose for which the warranty is applicable. "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *Am. Suzuki Motor Corp. v. Superior Ct.*, 37 Cal. App. 4th 1291, 1295 n.2 (1995) (citation omitted). For instance, "shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." CAL. COM. CODE § 2315, cmt. 2.

Here, the "general purpose" of a vehicle is to provide transportation. Courts have recognized that using a car for transportation does not constitute a "particular purpose" to bring a claim for a breach of implied warranty of fitness. *See Am. Suzuki Motor Corp*, 37 Cal. App. 4th at 1295 n.2. That was not why Uddin purchased the Subject Vehicle. The parties agree that he did so as a "collectible." Given the Subject Vehicle's expense and Uddin's intended use of it, there is no dispute that the Subject Vehicle is, in general, a collectible. The question is whether Uddin's definition of his particular purpose is cognizable to support his breach of warranty claim. It is not.

Uddin's vision for the Subject Vehicle was to "maximize [its] collectability, value, future appreciation, provenance, and preservation of its new and pristine factory built condition." SAC ¶ 152.b. This, in his view, required the Subject Vehicle to be more than "just a collectible" in a general sense—instead, his "particular purpose" required ALA to produce a vehicle with "specific attributes" that the Subject Vehicle had that made it uniquely collectible to *him*. Supp. Oppo. at 2;

Oppo. at 11. A problem for his claim is that he was not explicit concerning all of those attributes, some of which he believes were implied in the purchase.

In this litigation, Uddin initially identified those attributes as the following:

> After a reasonable inquiry, Plaintiff's PARTICULAR PURPOSE was to acquire and add the new SUBJECT VEHICLE as a collectible vehicle to his car collection and preserve it. Consistent with Plaintiff's PARTICULAR PURPOSE would be that the SUBJECT VEHICLE would arrive to Plaintiff in new factory original condition; be built and delivered in compliance with the manufacturer's original factory specifications and quality control standards and requirements at production, pre-delivery inspection, and delivery; be optioned and customized as agreed in the design and order process; have numbers matching; and have the SUBJECT VEHICLE'S factory original provenance intact.

Kim Decl., Ex. B (Rog. No. 19). During the litigation, his definition of the attributes evolved:

> "[w]hether the Vehicle is in fact suitable for Plaintiff's particular purpose . . . turns on, among other things: (a) configuration and feature-content discrepancies in the Vehicle's Ad Personam build, including the absence of the intended carbon skin interior content from the 2019 Geneva Auto Show launch SVJ Roadster that the Vehicle's interior was based on; (b) engine-cover and exterior-condition issues, including the originally damaged engine cover and then a replacement engine cover that was not factory prepared or installed, non-factory finishes and hardware, damaged glass, missing part-label stickers, and labels and locks that are not numbers patching, as well as damage to other components such as the emergency driver's door-handle cover; (c) mileage and documentation defects, including inaccurate odometer readings on the bill of sale, lease, warranty, and service records, missing repair orders and invoices, incomplete warranty and service documentation, an anomalous "Cupón A 1500 mls" entry recorded on the transaction date, and other gaps and inaccuracies in the Vehicle's records and warranty activation; and (d) the unrepaired condition and failed preservation of the Vehicle's factory original specifications, numbers matching, and provenance."

Oppo. at 8–9.

While the parties agree that the Subject Vehicle qualifies as a collectible, is purchasing a good to be a "collectible" a particular purpose under Section 2315 of the California Commercial Code? No court has addressed this, and it is not a question susceptible to categorical resolution. Instead, courts must perform a case-specific analysis considering both the ordinary expectations of the relevant market and of the good itself. Some goods, for example, are purchased for immediate consumption or use, such that displaying or collecting may reflect a buyer-specific purpose distinct from the good's ordinary use. Other goods are manufactured, marketed, and sold

substantially—or even primarily—as collectibles, such that collection and preservation may themselves constitute the ordinary purpose of the product. Trading cards, commemorative coins, limited-edition figurines, and similar items suggest that the "ordinary purpose" or use for some products may include retention, display, and collecting.

Uddin acknowledges that one of the central tenets to his definition of a "collectible" is that the vehicle would appreciate over time. *See, e.g.*, Uddin Dep. [Dkt. No. 102-1] at 49:8–19 ("So collectability is not just a benchmark that is only reserved for the highest ranks in exclusivity. It usually is what people like and appreciate . . . [Collectability is driven by] the market participants. The market is the market participants."); *id.* at 78:19–79:6 ("[Y]ou know, certain things that used to not be in a long time ago have become [collectable] because they were the odd duck out."); *id.* at 182:13–16 ("So an exclusive collectible naturally will appreciate with time, so while it's a consideration, it's not exclusively the consideration [for collectability]"). ALA responds that the "use as a collectible is inherently speculative," and "whether a vehicle qualifies as a collectible depends on subjective judgment and fluctuating market conditions." *Id.* at 11 (citing Coren Decl. ¶¶ 5–7; Uddin Dep. at 46:1–20, 49:8–19). Because Uddin's "alleged purpose is to maximize the value of [the collectible]," that purpose is "too general to constitute a 'particular purpose'" according to ALA. *Id.* (quoting *Goldsmith v. Allergan, Inc.*, No. CV 09-7088 PSG (EX), 2010 WL 11463630, at *3 (C.D. Cal. Feb. 24, 2010)).

ALA's expert witness, Lance S. Coren, supports its argument. *See* Declaration of Lance S. Coren in Support of Summary Judgment ("Coren Decl.") [Dkt. No. 102-3]. Coren is an automobile appraiser and consultant with over forty-five years of experience. *Id.* ¶ 2. Part of his role includes "evaluating and advising on exotic, high-value, and collectible automobiles, including Lamborghini vehicles." *Id.* ¶ 3. He notes that the collectability of a vehicle is "determined almost entirely by market forces" and factors "such as cultural trends, brand reputation, celebrity association, and shifting consumer preferences." *Id.* ¶ 5. Also inherent in the idea of a collectible vehicle is the "expectation that a vehicle will appreciate in value over time due to rarity, desirability, or historical significance." *Id.* ¶ 6.

Coren disputes Uddin's supposition that collectibility is driven by "specific options or

custom features selected by an individual buyer." *Id.* ¶ 8. "While certain options or configurations may influence the vehicle's market value or desirability among particular buyers," Coren notes, "they do not impact the fundamental collectibility of a vehicle." *Id.* Instead, "[c]ollectibility is driven primarily by the make, model, production numbers, and market perception." *Id.* Taken together, Coren recognizes that "collectibility necessarily involves an element of speculation, and no party—including the distributor or dealer—can accurately predict or ensure that a particular vehicle will appreciate in value or be regarded as a collectible in the future." *Id.* ¶ 7.

As Coren points out, it is hard to imagine how ALA could speculate what features of the Subject Vehicle would allow it to appreciate the most over time. Moreover, many of the features that were particular to Uddin's particular purpose—including matching numbers and the odometer readings—were never expressly mentioned to ALA, and were instead "implied" by Uddin based on his status as a "collector." *See* Uddin Dep. at 204:7–16; 206:3–14; *see also id.* at 205:12–206:2 ("So at the time [around August 2019] . . . [ALA] knew that I wanted a new vehicle built by the factory. So the allocation entitled me to having such a vehicle. So at that part, you know, expressly saying that it needs to be 100 percent factory original when I believe new is exactly 100 percent original and also for the meeting the manufacturer's specifications and quality control standards and requirements, those also kind of go into that production process of the factory. So again, I would say that those are implied, but I feel that that's exactly part of the production construction that, you know, that's entitled from such an order.").

Uddin repeatedly referred during the litigation to maximizing the investment value of the Subject Vehicle, which California courts caution against recognizing as a particular purpose. *See, e.g.*, Uddin Dep. at 182:13–16 ("So an exclusive collectible naturally will appreciate with time, so while it's a consideration, it's not exclusively the consideration."); *id.* at 190:1–11 (noting that low mileage on the Subject Vehicle is a "unique attribute" that "seems to be a big factor of increase in the price valuation"); *see also Schied v. Bodinson Mfg. Co.*, 79 Cal. App. 2d 134, 141–42 (1947) ("There is no implied warranty that a [good] is the best on the market, or that it will accomplish a particular degree of efficiency. The implied warranty is fulfilled if the [good] is reasonably fit to

perform the work for which it is purchased."). It is hard to imagine how purchasing a vehicle with specific features that would allow it to maximize appreciation in value is a proper "particular purpose."

The primary unresolved issue regarding the Subject Vehicle today is the discrepancy between the lease contract listing the vehicle's odometer as 40 miles, versus the "Cupón" paperwork and actual odometer reading 30 miles. This was not an issue raised until the end of the lease period, more than three years after he had received the documents in question. Uddin suggests that these documents "falsely represented the vehicle's cumulative mileage, creating a false mileage record affecting the vehicle's public mileage history, integrity, and provenance as a collectible vehicle." SAC ¶ 139. But the 10-mile difference is insubstantial and Uddin has confirmed that the correct mileage was 30, not 40. This does not affect whether ALA has breached the implied warranty for a particular purpose.

**B. Skill and Judgment**

Uddin's breach claim also fails at the skill and judgment prong. "[A] buyer possessing equal or superior knowledge or skill with respect to the products purchased cannot establish justifiable reliance on the seller's skill or judgment." *G&H Diversified Mfg. LP v. Regreen Techs., Inc.*, No. SACV2100062CJCJDEX, 2021 WL 6618662, at *4 (C.D. Cal. Sept. 20, 2021) (internal quotation marks and citation omitted).

ALA asserts that "before the ordering process began, [Uddin] had already chosen the exact year, make, and model of the vehicle and paid a deposit to secure it," suggesting that he did not rely on ALA's skill and judgment in selecting the Subject Vehicle. Mot. at 13; *see* Uddin Dep. at 55:21–56:12 (Uddin indicating that he decided to purchase the Subject Vehicle upon tendering deposit "on or around June 15, 2018," prior to Monterey Car Week). Additionally, ALA maintains that Uddin is a "self-described car collector with approximately 30 vehicles in his collection," whereas "ALA, as the distributor of new Lamborghini vehicles, does not possess any specialized expertise in vehicle collectability." Mot. at 13. Given this informational asymmetry, along with Uddin's decision to lease the Subject Vehicle, ALA concludes that Uddin's argument fails. *See id.*

Uddin contends that because the Subject Vehicle was an "allocation-based, custom-built-to-order consumer good, in which selection of the Vehicle's equipment, options, customization, and exclusive content was required in order to configure the Vehicle so that it could be built," he was required to rely on ALA's "knowledge, expertise, guidance, suggestions, recommendations, in-person discussions, Ad Personam design session, and email correspondence." Oppo. at 15. He further asserts that the "Vehicle's final form as a consumer good depended on the subsequent configuration and furnishing processes that only ALA could control." *Id.* at 16. Therefore, his "preliminary decision to secure an allocation did not eliminate his reliance on ALA's skill and judgment in the[] later stages" of the configuration process. *Id.* Similarly, while Uddin does not dispute that he is a car collector, he maintains that this does not mean that he has "adequate knowledge or experience about the actual Vehicle to select or furnish it at the time he relied on ALA." *Id.* "Put another way," Uddin argues, "if [he] had such experience to be non-reliant, he would have designed and manufactured his own brand of automobile for himself." *Id.* at 16–17.

*Keith v. Buchanan*, 173 Cal. App. 3d 13 (1985), relied upon by ALA, is instructive. In *Keith*, a California Court of Appeal panel found that a plaintiff failed to state a claim for a breach of an implied warranty of fitness for a particular purpose when he did not "rely on the skill and judgment of the defendants to select a suitable" boat. *Id.* at 25. Plaintiff was a sailor who purchased a sailboat from defendants. *Id.* at 18. At the time of purchase, plaintiff had "extensive experience with sailboats . . . even though he had not previously owned such a vessel." *Id.* at 25–26. "He had developed precise specifications in regard to the type of boat he wanted to purchase," and had "looked at a number of different vessels, reviewed their advertising literature, and focused on [defendant's particular boat] as the object of his intended purchase." *Id.* at 26. Additionally, plaintiff had "friends look at the boat before making the final decision to purchase." *Id.* In light of these findings, the Court of Appeal found that the plaintiff did not rely on any skill or judgment by the seller in selecting the ship in question. *See id.*

Like the plaintiff in *Keith*, the record shows that Uddin had significant knowledge about the Subject Vehicle and his desired attributes. Uddin personally owned over thirty cars; the vast majority are undisputably "collectibles." And while Uddin describes his relationship with ALA as



United States District Court
Northern District of California

being "led and guided by [ALA's] skill/judgment through [their] own selection and furnishing programs and processes," emails between the parties show that Uddin often was the one leading these conversations. Supp. Oppo. at 5. For example, in September 2019, when examining the unique specifications for the Subject Vehicle, Uddin emailed Giger, noting that he discovered "some of the specs [in the configuration code] such as wheel color, interior details, steering wheel, calipers and a few other details [we]re inaccurate." Supp. Ex. I [Dkt. No. 26] at 43. He also suggested that he was "happy to help the team double check accuracy of options and codes if [he obtained certain] document[s] and list of Lamborghini's recorded options for [his] car." *Id.* These facts suggest that Uddin held himself out as an equal to ALA in choosing to purchase the Subject Vehicle.

ALA asserts that it lacked the requisite skill and judgment to provide a vehicle to satisfy Uddin's idiosyncratic, express and implied definition of a collectible. Mot. at 12. While ALA maintains "expertise regarding available options and configurations for the Subject Vehicle," that "knowledge does not extend to determining the vehicle's collectability or its suitability as a collectible." *Id.* Collectability is "determined by the market, not by the distributor or seller," so ALA could not have known whether the Subject Vehicle "would be deemed a collectible at the time [Uddin] participated in the Ad Personam and finalized the configuration of the Subject Vehicle." *Id.* Although it admits to having "expertise regarding available options and configurations for the Subject Vehicle," such "knowledge does not extend to determining the vehicle's collectability or its suitability as a collectible." *Id*

While ALA may have knowledge of whether a vehicle is in "new and pristine factory condition," it was not its job to determine and did not know what will be a collectible in the market—much less a collectible to Uddin. Uddin's evidence does not establish a dispute of fact suggesting the contrary. *See*, *e.g.*, Uddin Supp. Ex. I. at 41 (October 18, 2019 email from Thanh Thai, Sales Planning Analyst for ALA, noting to Uddin that the "SVJ 63 Coupe . . . is a very exclusive model."); *id.* Ex. P (Giger Dep.) at 32:12–17 (Giger noting that a particular livery color for the Subject Vehicle was "no good"); *id.* Ex. Q at 68 (email from Giger acknowledging that the Subject Vehicle was a collectible and "will probably be driven less than 50 miles," and that the

United States District Court
Northern District of California

"over spray on the parts makes the car appear to a collector as a repainted part," which was "unacceptable to Mr. Uddin . . . [as] he has made . . . very clear.").

Given ALA's lack of knowledge and ability to predict the market's forces to determine what constitutes a collectible, summary judgment is independently warranted on the skill and judgment prong of the implied warranty analysis.[5]

**IV. Damages**

The parties dispute whether Uddin is entitled to damages for ALA's purported breach of the implied warranty of fitness for a particular purpose. Because I do not find Uddin has a viable implied warranty claim, I decline to address damages. Given his desire to keep the car as a collectible, it would seem impossible to predict the difference in the value of the Subject Vehicle at some indeterminate time in the future between its current condition and the condition Uddin wishes it was in.

**CONCLUSION**

For the foregoing reasons, ALA and BAPA's motion for summary judgment is GRANTED. Judgment in their favor, and against Uddin, shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: September 8, 2026

William H. Orrick
United States District Judge

[5] BAPA's sur-reply [Dkt. No. 129] additionally argues that "Plaintiff also combines two different concepts – (1) skill and judgment in selecting the fit and finish and (2) skill and judgment in furnishing, i.e., manufacturing, the Vehicle. See, Doc. 124, p. 5:24-25. BAPA's role, if anything, is only in selection as it has no involvement with the manufacturing process. Plaintiff's ongoing complaint is about the manufacturing of the Vehicle. The mechanical conditions were repaired before the Vehicle was delivered to Plaintiff." *Id.* at 3. "What is [a] conflict for Plaintiff is that there are no allegations that the finishes selected were defective. It was the manufacturing process that created the complaints about the condition of the Vehicle that Plaintiff currently is seeking." *Id.* at 4. The evidence of records supports this as a separate, undisputed ground to grant summary judgment for BAPA.